



FILED

JUL 2 4 2012

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

# NOT FOR PUBLICATION

1

2

3

4  **UNITED STATES BANKRUPTCY COURT**

5  **EASTERN DISTRICT OF CALIFORNIA**

6  **SACRAMENTO DIVISION**

7
In re:                                      Case No.: 10-36636-A-7

8
MOHAMADREZA K. SIADATAN and DAWN            Adv. No.: 10-02593-A
9  ANGELA SIADATAN,
                                            Chapter 7
10          Debtors.
                                            FINDINGS OF FACT AND
11                                          CONCLUSIONS OF LAW
ROBERTO CARDARELLI, D.O.,
12
            Plaintiff,
13                                              U.S. Courthouse,
                                                Sacramento, CA
14          v.                                  Honorable Richard T. Ford

15  MOHAMADREZA K. SIADATAN and DAWN
ANGELA SIADATAN,
16
            Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

1

## INTRODUCTION

Plaintiff Roberto Cardarelli, D.O., M.P.H., F.A.A.F.P. ("Dr. Cardarelli") filed his Complaint herein on September 23, 2010, requesting judgment against defendants Mohamadreza K. Siadatan ("Siadatan") and Dawn Angela Siadatan ("D. Siadatan") (sometimes collectively "Defendants" or the "Siadatans") for such sum in excess of $87,000 as may be proved, plus punitive damages, and that the judgment be declared to be non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6). Defendants filed their Answer on October 20, 2010, denying the material allegations of Dr. Cardarelli's Complaint.

## APPEARANCES AND TESTIMONY

Dr. Cardarelli was present in court and represented by attorney Peter C. Bronson of the Law Offices of Peter C. Bronson, a Professional Corporation. Both Defendants were present in court and represented by attorney Dale Orthner of the Law Office of Dale Orthner. The Court received the parties' written Testimonial Declarations pursuant to Local Rule 9017 of this Court and the Order Setting Trial filed September 22, 2011, as well as the live testimony of each of the parties; Dr. Cardarelli's wife, Kathryn Cardarelli, Ph.D. ("K. Cardarelli"); and third party witness James Liang, Jr. [Dr. Cardarelli's declaration was received as Exhibit 14.]

## JURISDICTION

The Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52 of the Federal Rules of Civil Procedure.    Jurisdiction exists pursuant to 28 U.S.C. § 157(a) and General Orders 182 and 223 of the United States District Court, Eastern District of California. This is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (I).

FINDINGS OF FACT

1.    Dr. Cardarelli is currently the medical director of the ambulatory system associated with Weatherford Regional Medical Center in Weatherford, Texas.  He is also Director of the Primary Care Research Center at the University of North Texas Health Science Center, and holds academic appointments at both the University of North Texas Health Science Center and UT Southwestern Medical Center. He practices Family Medicine, was recognized as one of the "Top Docs in Fort Worth" in 2007 by the Fort Worth Business Press, and has received the "Compassionate Physician Award" and "Patients Choice Award" from Vital.com for the past several years.  He is an experienced researcher in cardiovascular disease, cancer screening, mental health, and primary care health impact, with more than 40 publications and more than 40 national and international presentations.

2.    Dr. Cardarelli and Siadatan met around 1993, when they were both sophomores at the University of California, Davis.  During

college, they formed a "DJ" business together, playing music at various school parties and dances in Davis, which they operated until Dr. Cardarelli completed coursework in 1995, with graduation commencement in Spring 1996.

3.   While they were at UC Davis, Dr. Cardarelli and Siadatan had discussed the possibility of collaborating in business ventures on a part-time basis after college.  Siadatan had worked at American Design, a promotional merchandising company.  Dr. Cardarelli had started a small company called Alpini Enterprises which did small silk screening and embroidery jobs.  With these backgrounds, they planned and started in 2004 a small home business called Fox Promotional Merchandising ("FPM").  Dr. Cardarelli's primary roles were to provide the start-up funding of $1,000, to design and manage a website, and to strategize for the growth of the business.  Siadatan invested $100 in the business, in connection with the opening of a checking account. Siadatan handled the day-to-day operations of FPM out of his home in Mercer Island, Washington; Dr. Cardarelli was living and practicing medicine in Texas (as he has continued to do at all times).

4.   Siadatan went to a Bank of America branch in the State of Washington on February 25, 2004 to open the FPM checking account.  Dr. Cardarelli was in Pearland, Texas at that time.

5.   In connection with the opening of the account on that date, Siadatan forged Dr. Cardarelli's signature on a credit card guarantor form, purportedly obligating Dr. Cardarelli as guarantor of the FPM's obligations to the bank.  The guarantor form was admitted into

4

evidence as Plaintiffs' Exhibit 3.  Dr. Cardarelli never authorized Siadatan to sign his name.  In fact, in Siadatan's deposition testimony and trial testimony in this adversary proceeding, Siadatan admitted that he signed Dr. Cardarelli's name.

6.    Siadatan's testimony, to the effect that B of A was willing to accept a guaranty on which Dr. Cardarelli's name was signed by someone else, was not credible.  Likewise, Siadatan's testimony, to the effect that Dr. Cardarelli told him to sign Dr. Cardarelli's name on the guarantor form because it was inconvenient for Dr. Cardarelli to go to his local bank branch to do so, lacks credibility.

7.    In fact, Siadatan had never suggested to Dr. Cardarelli that Dr. Cardarelli would be a personal guarantor.  Siadatan's contention that Dr. Cardarelli asked him to sign Dr. Cardarelli's name was refuted by Exhibit 15, an email dated February 26, 2004, whereby Siadatan informed Dr. Cardarelli that he (Siadatan) had gone to Bank of America and opened the business account.  Dr. Cardarelli obviously had not given Siadatan any signature authority in connection with the opening of the account, because Dr. Cardarelli did not even know that Siadatan had gone to the bank and had opened the account.

8.    Further, Siadatan acknowledged that when the account was opened, the documents which Dr. Cardarelli needed to sign were sent to the Bank of America branch near Dr. Cardarelli, in Pearland, Texas. Siadatan could not explain why the guarantor form (which he purported to sign for Dr. Cardarelli) had not simply been included with the other documents that needed to be signed.

5

9.   In his testimonial declaration, Siadatan said that Dr. Cardarelli had "complained about how inconvenient it had been for him to find a lunch hour to go in and sign the documents."  However, Dr. Cardarelli responded to Siadatan's February 26 email about the opening of the bank account by stating:  "Sounds great.  Send [the documents for signature] to Branch 2. . . . How soon before I can deposit money?"

10.   During its brief life, FPM primarily functioned as a "middleman"; it obtained orders from customers for custom T-shirts and personalized items, and it utilized a line of credit to obtain "blank" shirts and other items upon which Siadatan would place the design per the customer's order.

11.   At the outset, Siadatan and Dr. Cardarelli discussed the possibility of obtaining business lines of credit, so that they would have that availability in the event that they ever received substantial orders that required up-front costs prior to being fully paid by the customer.  They discussed the fact that their need, if any, for such credit would be low because the 50 percent deposit they required from their customers would easily cover up-front costs.

12.   Based on their discussions, Siadatan applied for an American Express Blue Business Card for FPM with a credit limit of $5,800, and Dr. Cardarelli applied for a Fleet Visa card for FPM with a credit limit of $5,000.

13.   Siadatan and Dr. Cardarelli each received credit cards on both of these accounts.  However, Dr. Cardarelli never activated or

6

used his cards; and Siadatan and Dr. Cardarelli had a clear understanding that Siadatan could use his cards solely to pay ordinary and necessary business expenses of FPM.

14.   Dr. Cardarelli never discussed with Siadatan, much less approved, the use of any FPM credit card or credit line for personal use.   Nor did Siadatan ever ask Dr. Cardarelli for such approval.   FPM never achieved a sufficient level of business success or growth to have any need for higher credit limits.   Dr. Cardarelli was not aware of, and never authorized, any attempt by Siadatan to increase the credit limits on these cards since there was no business need to do so.

15.   Siadatan testified that increased credit limits would help FPM improve its credit rating.   However, the variouso credit card statements admitted in evidence showed that as Siadatan obtained each of numerous credit limit increases, the debt owing on the card in question quickly increased to approach or even exceed the new limit.

16.   In early 2009, the monthly American Express statements showed balances in excess of $43,000, against a credit limit of only $42,000.

17.   At the inception of the business in 2004, Siadatan told Dr. Cardarelli that he was using the American Express Blue Card to make small business purchases such as office supplies, but that the balance was fully paid off each month – primarily by using the initial $1,000 Dr. Cardarelli had personally invested in FPM.   However, Siadatan

7

admitted on cross-examination that as early as 2004, he was making only small payments on the credit card balance owed.

18.   Siadatan intimated that he could have made higher payments but that it was beneficial to the business to show that it was carrying credit card balances.  However, it is clear that Dr. Cardarelli insisted, and assumed, that the balances were being paid in full each month, and that Siadatan had told Dr. Cardarelli that the balances were being paid in full each month. Further, Siadatan acknowledged on cross-examination that if credit limits were increased but reached, that would not be beneficial to the business.

19.   Around 2005, Siadatan told Dr. Cardarelli that he had purchased a condominium on Trossachs Boulevard in Sammamish, Washington.  FPM's operations, such as they were, were thereupon moved from the residence Siadatan had been renting in Mercer Island, Washington to the Sammamish condominium which he purported to have purchased.  Siadatan repeatedly told Dr. Cardarelli that he had bought the Sammamish residence.  He also boasted on various occasions that "his" condominium was rapidly appreciating in value.  He made these statements not only in Dr. Cardarelli's presence, but also in the presence of Dr. Cardarelli's wife, K. Cardarelli, and a mutual friend, James Liang, Jr. ("Liang"), when Liang and the Cardarellis visited and stayed with Siadatan in "his" condominium in late 2004.  Siadatan gave the Cardarellis a tour of the condominium, and talked about how "his" equity was increasing because property values were going up.  He told Liang that he had paid less than $200,000 for the condominium, and

8

that its value had increased by about $200,000.

20.   In 2005, FPM went dormant when Siadatan told Dr. Cardarelli that he had enrolled in a dual degree law school and physician assistant program at the University of Washington and did not have time to do any marketing for FPM.  From that point forward, FPM had virtually no business, nor any income.  Indeed, Dr. Cardarelli introduced in evidence K-1 forms for FPM for 2007 and 2008 (Trial Exhibits 6 and 7) that showed virtually zero business activity for FPM.

21.   In fact, FPM made almost no money at any time.  Its most profitable year apparently was 2004, in which its ledger (Exhibit 13) showed gross sales of $12,492.76.  Dr. Cardarelli testified that he and Siadatan did not expect FPM to be a significant source of income for themselves, but looked at it more as a hobby.  It had only a few orders in 2004-05.  The only distribution ever made out of FPM to the two partners, during its entire existence, was about $300 each.

22.   Meanwhile, Siadatan and Dr. Cardarelli remained best friends.  They met in Colorado for a hiking trip and visited each other quite frequently.  When Siadatan and D. Siadatan were married, Dr. Cardarelli was in the wedding party.  When Dr. Cardarelli married K. Cardarelli in 2001, Siadatan was the best man at the wedding.

23.   They spoke on the phone three or four times a week, and communicated frequently by email.  Siadatan regularly updated Dr. Cardarelli concerning his progress at the University of Washington

9

School of Law.  Siadatan consistently reported that he was doing extremely well in his law school courses and getting good grades.

24.  When Siadatan told Dr. Cardarelli, in or about 2006, that he had graduated from the University of Washington School of Law, Dr. Cardarelli sent him an expensive stainless steel barbecue as a graduation present.  Dr. Cardarelli testified that Siadatan thanked him for the gift; "[h]e was very excited . . . very happy and appreciative."

25.  Siadatan did not invite Dr. Cardarelli to his law school graduation; Siadatan explained to Dr. Cardarelli that he was not planning to "walk" at his graduation.

26.  Siadatan had told Dr. Cardarelli that he had graduated from UC Davis with three majors:  Biology, Latin or classical civilization, and history; and that thereafter, Siadatan received a scholarship in history for a Ph.D. program at the University of Arizona and moved to Tucson, Arizona.

27.  Dr. Cardarelli subsequently learned, only through the reading of Siadatan's deposition in this adversary proceeding, that Siadatan never graduated from UC Davis at all, much less with three majors; hence, Siadatan never could have participated in a Ph.D. program, much less been offered a scholarship for a Ph.D. program.

28.  Siadatan moved from Tucson, purportedly leaving the purported Ph.D. program; he told Dr. Cardarelli that he was doing so because he had met his current wife, D. Siadatan, always wanted to live in the northwest, and allegedly obtained a job as a Vice

10

President of Marketing for a company called "Onvia". Dr. Cardarelli

later learned, from Siadatan's deposition, that Siadatan apparently

did not obtain such a position.

29.  Siadatan told Dr. Cardarelli, after he supposedly had

graduated from the University of Washington School of Law, that he

taught an "Introduction to Law" course at the law school. At trial,

K. Cardarelli testified concerning Siadatan's 2009 visit with the

Cardarellis in Texas. K. Cardarelli, who is an award-winning tenured

professor in Epidemiology at the University of North Texas Health

Science Center, testified that during that 2009 visit, she and

Siadatan had explicit and lengthy conversations about student issues,

preparing for lectures, and similar topics. Other members of the

Cardarelli family interacted with Siadatan during this visit.

Although Siadatan testified that he did not recall the 2009 visit, or

having any conversations with K. Cardarelli in Texas, the Court finds

K. Cardarelli's testimony on those issues to be credible.

30.  Siadatan complained to Dr. Cardarelli that his (non-

existent) teaching position did not pay much, but that he recognized

that it was his first job after law school. In fact, not having

attended or graduated from law school, Siadatan never had a teaching

position, either at a law school or otherwise.

31.  After supposedly leaving his position teaching law school,

Siadatan told Dr. Cardarelli that he had gone to work for a printing

company as its legal counsel and Vice President. However, soon

thereafter he informed Dr. Cardarelli that he had been terminated from

11

that position.  He told Dr. Cardarelli that he had not found any work since then.  Siadatan also told Dr. Cardarelli that he had obtained a position as an intern for a law firm in preparation for taking the California Bar Examination.  However, soon thereafter he informed Dr. Cardarelli that he had been terminated from that position as well.

32.   In late 2008, Siadatan moved to Roseville, California, and took up residence in a home owned by his brother Ramak Siadatan. Siadatan told Dr. Cardarelli that he was going to rent out his Sammamish condominium and purchase a new home in Roseville, California, a few blocks from the brother's home.

33.   Siadatan told Dr. Cardarelli, in connection with the anticipated home purchase, that in order to qualify for special financing that the Roseville developer was offering, Siadatan had to pay down an equity line of credit on his condominium in Sammamish, Washington.  Siadatan also told Dr. Cardarelli that his wife, D. Siadatan, had obtained a legal aide or paralegal job with a Sacramento law firm.

34.   Siadatan told Dr. Cardarelli that once he bought the Roseville home, he would then use the equity line of credit on the Sammamish condominium to immediately repay Dr. Cardarelli's $12,000 loan.  Dr. Cardarelli proceeded to lend Siadatan the $12,000 in December 2008.  Dr. Cardarelli did so based upon Siadatan's representations concerning (a) why he needed the money, (b) his ability to use the equity in the Sammamish condominium to promptly repay Dr. Cardarelli, (c) the lack of FPM debt, and (d) the earning

capacity evidenced by (i) Siadatan's alleged professional degrees and career accomplishments and (ii) D. Siadatan's new law firm position.

35. Siadatan never made any payment against the loan. Instead, he told Dr. Cardarelli that the value of his Sammamish condominium had plummeted; and that he had lost his tenant there, and therefore could not pay Dr. Cardarelli back immediately.

36. In fact, Siadatan never attempted or intended to buy a house, in Roseville or otherwise.

37. Also in 2008, because FPM had been essentially inactive for several years, Dr. Cardarelli told Siadatan that they needed to formally close the business. Siadatan assured Dr. Cardarelli that all FPM accounts, including credit cards, had been closed. This proved to be false; Dr. Cardarelli did not know it was false, because (a) Dr. Cardarelli believed Siadatan; (b) all statements on the accounts went to Siadatan, never to Dr. Cardarelli; and (c) FPM had been essentially dormant since 2005. They filed a final tax return for FPM in 2008.

38. Only subsequently did Dr. Cardarelli learn that Siadatan: never graduated from UC Davis, much less graduated with triple majors; never even enrolled in law school, much less graduated; never taught at a law school, or anywhere else; was never legal counsel to or an officer of a printing company; never worked for a law firm; never owned a condominium in Sammamish, much less had a tenant or credit line; never intended to (nor did he ever) purchase a home in Roseville; and has never owned any real property or any interest in real property.

39.    At trial, D. Siadatan confirmed that her husband did not graduate from college, and that he never applied for admission to any law school.  However, Liang testified that on his and Dr. Cardarelli's 2004 visit to the Sammamish, Washington condominium supposedly owned by Siadatan, Liang asked Siadatan how Washington University Law School was going, and Siadatan responded that "it was good".

40.    In early 2009, Siadatan told Dr. Cardarelli that he had been the victim of identity theft.  Siadatan said that new companies were being formed, and were using his Social Security number to obtain false Employer Identification Numbers.  Siadatan told Dr. Cardarelli that fraudulent acts had been committed against him throughout the United States, resulting in collection departments contacting him on a daily basis concerning credit card debt that was not his.

41.    Siadatan described the alleged identity theft differently at trial.  He testified that banks notified him of fraudulent charges being made on all six of his FPM credit cards, and personal credit cards as well.  In his deposition, Siadatan had testified that he did not believe there were any fraudulent charges on any bills, except possibly some on American Express bills; but he was unable to identify any specific fraudulent charge at all, whether by American Express or otherwise.  Siadatan said at deposition that he would review the American Express bills to see if there were any that contained fraudulent charges; and that if there were any such bills, he would produce them.  But he did not produce any such bills; at trial, he testified that he did review the American Express bills following his

14

deposition, and that he did not find any fraudulent charges on them. Further, Siadatan could not explain why, despite the alleged fraudulent charges on American Express bills, the American Express accounts remained open at all times, with no change in account numbers; and the credit cards were not cancelled.  Indeed, Siadatan testified that he continued to use the American Express cards after the supposedly fraudulent charges had been discovered.  American Express's conduct in this regard is inconsistent with any fraud having been reported.

42.   In addition, the allegation that fraudulent schemes arose simultaneously on more than a half dozen different credit cards, from multiple banks, is neither credible nor supported by the evidence. Siadatan testified that he had been told that the fraud was perpetrated by someone taking the cards and "re-doing" the magnets. There is little or no likelihood that this could have occurred in connection with so many different credit cards.

43.   Moreover, if there was any credit card fraud, Siadatan did very little about it.  He said there was identity theft in connection with the Staples and Home Depot cards which he obtained (for no business reason and without Dr. Cardarelli's knowledge) for FPM, but that he was unaware of any correspondence concerning it.  He also said he filed one police report in Roseville, but took no other legal action in connection with the alleged identity theft.

44.   Siadatan told Dr. Cardarelli that dealing with all the debt collectors and identity theft issues became a full-time effort,

15

prohibiting him from studying for the California Bar exam.  Initially, because of their longstanding friendship, Dr. Cardarelli believed Siadatan, and assumed that these events had delayed Siadatan in repaying the $12,000 he had borrowed from Dr. Cardarelli.  In these conversations, Siadatan never disclosed to Dr. Cardarelli that any of the supposedly closed FPM credit card accounts were still open, that there were any unpaid charges on them, or that he had purported to name Dr. Cardarelli as a guarantor on any credit card accounts.

45.   Then, in April through June of 2009, Dr. Cardarelli started receiving threatening calls from American Express, claiming that Dr. Cardarelli was responsible for paying past due balances in excess of $55,000 on two FPM credit cards as to which Siadatan had listed Dr. Cardarelli as guarantor.  Initially, Dr. Cardarelli refused to pay American Express because, according to Siadatan, there was no debt owed; again, he claimed he had been victimized by identity theft.

46.   Dr. Cardarelli never made or authorized any charges on these cards.  Nor had Dr. Cardarelli ever authorized Siadatan to use the cards for anything but legitimate FPM business expenses.  Dr. Cardarelli had told Siadatan that he could use the cards for business expenses only, and that the balances were to be paid in full each month.  And again, because FPM did virtually no business, there were virtually no business expenses.

47.   Siadatan told Dr. Cardarelli that the total balance on the American Express Blue card was entirely the result of the supposed identity theft, and that Siadatan was dealing with American Express

16

and took full responsibility.  Siadatan also testified under oath, at
the First Meeting of Creditors held pursuant to 11 U.S.C. § 341(a),
that he was solely responsible for all the FPM credit card charges.
[The transcript of the Section 341(a) meeting was admitted in evidence
as Exhibit 1.]

48.   Siadatan claimed that he had written letters to American
Express and had attempted to remove Dr. Cardarelli as a guarantor of
the cards.  Dr. Cardarelli questioned Siadatan as to why he had not
told Dr. Cardarelli that one of the FPM cards was involved with his
supposed identity theft problem, but he never responded.

49.   In about September 2009, Siadatan admitted to Dr. Cardarelli
that approximately $49,000 of the American Express balance represented
personal expenses of the Siadatans that had been charged to one of the
cards.  In fact, he falsely told Dr. Cardarelli that he had converted
that card from a business to a personal card.

50.   Dr. Cardarelli testified that the law firm of Zwicker &
Associates and a collection agency known as Nationwide Credit had
reported him to the three major credit reporting agencies as
delinquent for not paying the American Express bills incurred by Mr.
and Mrs. Siadatan.  This has severely damaged Dr. Cardarelli's credit
score, which has fallen from over 800 to the 500s; and it has resulted
in denial of an equity line of credit for which Dr. Cardarelli had
applied with Bank of America ("B of A").  Moreover, these companies
have interrupted Dr. Cardarelli's daily life, called his family
members, and called directly to his hospital when Dr. Cardarelli was

17

serving as the interim chairman for family medicine, creating severe embarrassment and humiliation.

51.    Dr. Cardarelli has contacted all three of the credit reporting agencies to dispute the charges in question.  Dr. Cardarelli has also sent "cease and desist" letters and explanatory letters to American Express and their agents; copies of those letters were admitted into evidence as Plaintiff's Exhibit 10.  However, Dr. Cardarelli testified that Siadatan had failed and refused to furnish the necessary information to persuade these agencies that the charges in question were not his, and that Dr. Cardarelli had not guaranteed their payment.

52.    Also in September 2009, Dr. Cardarelli began receiving calls from B of A concerning an alleged late payment on an FPM business credit card (apparently the replacement for what originally had been FPM's Fleet Visa card).  B of A confirmed that Dr. Cardarelli's card had never been activated, and that all of the unpaid charges (totaling over $20,000) were Siadatan's.  Dr. Cardarelli testified that this has created enormous· distress for his wife and himself, since they had been banking with B of A for more than 20 years, and B of A holds our home mortgage.

53.    At first, B of A stated there was more than $3,000 in late payments due and Dr. Cardarelli, again, immediately contacted Siadatan.  Siadatan initially stated that these obligations were due to his identity theft.  But B of A stated that regular payments were being made by Siadatan up until mid-2009.

54.   One day during September 2009, Dr. Cardarelli learned that B of A had taken $3,483 from his personal B of A checking account. When Dr. Cardarelli confronted B of A about this, Dr. Cardarelli learned that this charge was related to *two* B of A MasterCards associated with FPM, which Dr. Cardarelli never knew anything about. Dr. Cardarelli also learned there was another $20,000 allegedly owed on the Fleet card which Dr. Cardarelli had never used.

55.   Dr. Cardarelli immediately became suspicious of Siadatan and D. Siadatan, and skeptical about everything Dr. Cardarelli had been told to date. When Dr. Cardarelli confronted Siadatan about this, he seemed extremely nervous, and at first he claimed that the MasterCards were not FPM cards at all but, rather, were his and his wife's personal cards.

56.   However, once a B of A representative reviewed the numbers and stated that these were *always* FPM cards, Siadatan quickly abandoned this claim and admitted to Dr. Cardarelli that the cards were, in fact, FPM cards. Given FPM's dormancy, Dr. Cardarelli knows that these cards could not have been used for any legitimate FPM expenses, or for anything other than the Siadatans' personal expenses.

57.   Jennifer Zarate of B of A subsequently told Dr. Cardarelli that there were two MBNA MasterCard accounts linked to FPM, as to which Dr. Cardarelli had no prior knowledge, and that there were unpaid charges on those accounts of more than $29,000 on one card and more than $4,000 on the second card. Ms. Zarate told Dr. Cardarelli

19

that he was listed as the guarantor on those accounts; again, Dr. Cardarelli never agreed to be the guarantor, and Siadatan has admitted to Dr. Cardarelli that he gave these banks Dr. Cardarelli's name and told the banks that Dr. Cardarelli was to be the guarantor. Siadatan further admitted to Dr. Cardarelli that the two accounts were business accounts, not personal accounts.

58.    Also in 2009, Siadatan admitted to Dr. Cardarelli that D. Siadatan had been using one of the FPM business credit cards to charge thousands of dollars of personal expenses, which were part of the balance which B of A was seeking to collect from Dr. Cardarelli. Dr. Cardarelli never was asked to, nor did he, authorize issuance of an FPM credit card for D. Siadatan.

59.    The last quarter of 2009 was a flurry of calls and inquiries with B of A representatives and managers. Dr. Cardarelli was able to get all statements for both the Fleet cards and the B of A MasterCards, which he had not previously seen. Upon his review, it was immediately obvious to him that no charges were identity-theft related since they were all personal local or on-line expenses charged by both Siadatan and D. Siadatan. In fact, both in his deposition in this adversary proceeding and in his testimony at trial, Siadatan was unable to point to a single fraudulent charge; admitted that he had not suffered any economic loss whatsoever from any alleged identity theft; and admitted that all the unpaid credit card bills reflected personal expenses charged by the Siadatans.

60.    Siadatan asserted that Dr. Cardarelli must have known about

20

all the B of A personal charges, because he had on-line access to his own B of A mortgage account in early 2004. However, Dr. Cardarelli's testimony established that he had no such knowledge, and that in fact he had no B of A mortgage in early 2004.

61.    Siadatan obtained at least five credit cards for FPM that were unknown to, and unauthorized by, Dr. Cardarelli: one American Express card, two MBNA cards, a Staples card and a Home Depot card.

62.    Until he was contacted by American Express, Dr. Cardarelli never knew that the Siadatans had charged any personal expenses on any FPM credit card.

63.    A copy of a request for credit line increase, submitted by Siadatan on behalf of FPM, was admitted as Plaintiffs' Exhibit 4. Siadatan never told Dr. Cardarelli he was going to seek any credit line increase; nor did he ask Dr. Cardarelli to agree to such an application. Dr. Cardarelli never authorized Siadatan to make the application – or any other application for a credit line increase on any FPM card. Indeed, FPM never had any need for any increase in its credit line.

64.    In addition, even after the business had become dormant, Siadatan continued to increase the credit lines on its credit cards, without Dr. Cardarelli's knowledge, for the purpose of charging personal purchases. For example, Siadatan acknowledged that on the Fleet Visa card, he increased the credit line from $5,000 to $15,000 and then, in December 2007, to $20,000.

21

65.   In Exhibit 4, Siadatan represented to the bank that FPM's annual sales were $600,000.  Dr. Cardarelli never authorized Siadatan to make any such representation; and as evidenced by Exhibits 6, 7 and 13, gross sales never exceeded about $12,000.

66.   Throughout these events in 2009, Dr. Cardarelli asked Siadatan numerous times to send Dr. Cardarelli the letters he claimed he had sent to American Express, copies of requests he had purportedly made to remove Dr. Cardarelli as a guarantor, and all other correspondence which he said he had submitted to American Express. Siadatan persistently failed to provide these papers to Dr. Cardarelli, from which it is reasonable to infer that they never existed and were never sent.  The emails received in evidence as Exhibit 11 contain a number of Dr. Cardarelli's unanswered requests.

67.   In December 2009, another $2,800 was deducted from Dr. Cardarelli's personal B of A checking account, which Dr. Cardarelli learned was, again, due to late payments for the Fleet card.  Dr. Cardarelli had to then immediately close all his personal B of A accounts and open new accounts elsewhere.

68.   In January 2010 Dr. Cardarelli filed a report with the Parker County Sheriff's Department regarding Siadatan's acts, which to the best of Dr. Cardarelli's knowledge, remains in active investigation.

69.   American Express has sued Dr. Cardarelli for the amounts allegedly due on the Blue card.  That case remains pending in Texas.

22

In the course of that litigation, Dr. Cardarelli had his first opportunity to review credit card statements from American Express.

70.    Dr. Cardarelli has never received any statements or bills on any of the foregoing accounts.  It appears that Siadatan had all these bills sent to his address, at all times.

71.    The evidence indicates that Siadatan concocted the "identity theft" story in order to conceal his unauthorized use of Dr. Cardarelli's name and the forging of Dr. Cardarelli's signature.

72.    Between 2005 and 2009, before the foregoing facts came to light, Siadatan told Dr. Cardarelli that he was supporting himself and his family from his savings and the equity line of credit on his Sammamish condominium.  Dr. Cardarelli did not know that in fact, Siadatan had increased the credit lines on the dormant FPM credit cards, and had listed Dr. Cardarelli as the guarantor; or that he and his wife had supported themselves by charging personal expenses to these cards without Dr. Cardarelli's knowledge or consent.

73.    Schedule F filed herein by Siadatan and his wife admits that all the credit card liability is theirs.  They made the same admissions at their First Meeting of Creditors.

74.    The Siadatans plainly filed their bankruptcy case in the hope that their obligations, for all the personal items they bought with the FPM business credit cards, would be discharged, leaving Dr. Cardarelli as the only "target" for American Express, B of A and other creditors.

75.    Bank statements admitted in evidence as Exhibit 12 show that

the Siadatans made deposits into the FPM bank accounts on virtually a monthly basis, even long after FPM ceased doing business; and that they then wrote checks on those accounts to pay FPM credit card bills.

76.   D. Siadatan testified that her maximum monthly income during the period when the credit card charges were being made was $2,100 to $3,000.   Siadatan testified that he was unemployed during virtually all of this period.   D. Siadatan's employment (and, when he was receiving it, Siadatan's unemployment compensation) was the sole source of the Siadatans' income; yet the monthly deposits into the FPM bank accounts regularly exceeded 100% of the couple's income. Moreover, although Siadatan testified that his unemployment checks were about $600 per week, his Schedule I in this bankruptcy case represented that it was $325 *per month*.

77.   Clearly, the Siadatans were not only paying their living expenses but also purchasing luxury items and services by charging the purchases on the FPM credit cards.   In fact, Siadatan admitted in his trial testimony that there was no way for him and D. Siadatan to pay their everyday living expenses other than through charges on the FPM credit cards.

78.   In January 2009, when FPM had already filed its final tax return and closed down its business, Siadatan deposited $5,225 in FPM's account at B of A; and he wrote a check on that account for $3,268 to make a payment on the FPM American Express card.   In February 2009, he deposited $4,975 into the B of A account, and made

24

credit card payments and wrote a $2,000 check on that same account. It seems clear that Siadatan was writing checks on each account to purportedly pay bills on the other account, in effect operating a "check kite".  That conclusion is corroborated by Siadatan's inability to account for how he and his wife paid their living expenses *and* were able to make bank deposits of about $5,000 a month, when their total monthly income was around $3,000 or less.

79.   In February 2006, the Fleet Bank credit card bill for FPM showed a credit line increase of $10,000, and a check written for $9,933.99.  Siadatan did not know the purpose of that check.  There were many other credit line increases as shown on the bills; and each time the credit limit increased, the Siadatans made charges which used up virtually the entire increase.

80.   Personal charges started appearing on the FPM credit cards as early as 2004.  In later years, although Siadatan testified that he and D. Siadatan had been forced to "live off" the business credit cards, "on and off", from 2004 to 2009, the credit card statements admitted in evidence were rife with charges that were obviously not for either business or ordinary living expenses.  These included charges for expensive beauty salon visits, air travel, gym membership, cable television, and personal purchases at, *inter alia*, Nordstrom, Williams-Sonoma, Eddie Bauer, Starbucks, Toys R Us and Fry's Electronics.  The January 2008 bill alone included charges for Eddie Bauer, Nordstrom, Pacific Market, Claypit Cuisine, and Alaska Air – all acknowledged to be personal expenses, not business, and clearly

25

not for everyday living costs.  Other bills showed recurring charges for XM Satellite Radio, Netflix, Costco, and Amazon.com.

81.   The Siadatans had no means of or prospects for paying these charges – all of which were incurred without Dr. Cardarelli's knowledge or consent.  Instead, they attempted to foist the obligations onto the Cardarellis, and filed for bankruptcy in an attempt to discharge their own obligations on these charges.

82.   Siadatan admitted that he obtained an FPM credit card for D. Siadatan, with her name on the card.  He said he had told Dr. Cardarelli that he wanted D. Siadatan to have the card for use if she had to make a purchase on behalf of FPM.  Dr. Cardarelli testified that he never knew about the D. Siadatan card.

83.   Siadatan could not recall D. Siadatan ever making any business-related purchases on her FPM card, but admitted that she did charge at least several dozen personal purchases on the card. Billings on the D. Siadatan card showed purchases at Nordstrom, Starbucks and other merchants.  For example, the 2007 statements for the D. Siadatan card included at least two expensive beauty salon charges ($200 and $185 respectively), and multiple Nordstrom charges. The May 4, 2008 billing statement alone showed at least seven charges made at Starbucks by D. Siadatan.  D. Siadatan confirmed that she never did any work for FPM.

84.   D. Siadatan supports six attorneys as a litigation assistant at Quinn Emanuel Urquart & Sullivan, a large law firm with offices in nine cities.  She holds a legal support services degree from Lake

Washington Technical College.  Based on her employment and background, it was not reasonable for her to assume that she could make personal charges on her FPM credit card, particularly since she was unaware of any basis for payment of those charges.

85.   Siadatan admitted, both at trial and at his Section 341(a) meeting, that the unpaid charges owed to American Express totaled about $43,000; and to B of A, about $50,000.  These are the charges for which the institutions in question seek to hold Dr. Cardarelli responsible.

86.   Based on Siadatan's report of identity theft, Dr. Cardarelli told American Express and Bank of America that the charges were not legitimate.  Had Siadatan been honest with Dr. Cardarelli and had told Dr. Cardarelli that the charges had actually been incurred by the Siadatans, Dr. Cardarelli would not have lost credibility with American Express and Bank of America.  Under the circumstances, having told these institutions that there had been identity theft, the banks had no reason to trust his ensuing representation that although the charges were real, they were not his responsibility.

87.   Siadatan made matters worse for Dr. Cardarelli by failing to respond to Dr. Cardarelli's repeated, and unanswered, requests for copies of the documents Siadatan said he had sent to the credit card issuers, seeking to remove Dr. Cardarelli's name as a guarantor on the cards.  In discovery, Siatadan was unable to produce any such documents.

27

88.   Dr. Cardarelli has suffered the following easily quantifiable damages as a result of the Siadatans' fraudulent acts and conduct:

    a.   Dr. Cardarelli was required to retain and pay a total of $8,055.33 to retain Texas counsel to represent Dr. Cardarelli and protect his rights in connection with the credit card fraud.

    b.   As of the commencement of trial, Dr. Cardarelli had already been required to retain and pay in excess of $27,000 in fees and costs to the Law Offices of Peter C. Bronson, A Professional Corporation, to represent Dr. Cardarelli in these proceedings.

    c.   Dr. Cardarelli faces potential liability to American Express and Bank of America well in excess of $95,501.14 for fraudulent charges Dr. Cardarelli never made or authorized.   Those charges, as of the billing dates reflected by trial exhibits, included:

        1.   Fleet Bank:  $17,246.10 (Exhibit 16);

        2.   American Express:  $43,041.23 (Exhibit 17);

        3.   Bank of America (Siadatan charges): $30,451.01 (Exhibit 20); and

        4.   Bank of America (D. Siadatan charges): $4,762.80 (Exhibit 21).

Substantial interest has accrued on these charges since the billing dates, estimated at $25,000 or

more.

b.   Bank of America withdrew $6,283.00 from Dr.
     Cardarelli's accounts to pay the Siadatans' debts.

c.   The $12,000 loan to Siadatan has not been repaid, in
     whole or in part.

88. Even without taking into account the interest on the credit card bills, Dr. Cardarelli's liquidated damages total at least $143,184.47.

89. In addition, Dr. Cardarelli has suffered significant unliquidated damages, including the following:

a.   Extreme emotional stress as a result of these events, not
     only because of the financial exposure but also because Dr.
     Cardarelli was victimized by people he trusted.   This stress
     resulted in his resignation as Chairman of Family Medicine at
     the University of North Texas Health Science Center on March
     31, 2010.

b.   Dr. Cardarelli started his new position at Weatherford
     Regional Medical Center on September 1, 2010.   The transition
     cost Dr. Cardarelli almost $20,000 in reduced income per year.

c.   Dr. Cardarelli was turned down by Bank of America for an
     equity loan against Dr. Cardarelli's residence, depriving Dr.
     Cardarelli of the use of potentially several hundred thousand
     dollars.

d.   Dr. Cardarelli's credit rating has been downgraded, causing

29

irreparable damage that cannot readily be calculated.

e.    Dr. Cardarelli has lost approximately 30 hours of work time because of tasks Dr. Cardarelli had to perform due to the Siadatans' fraud, including:  Communicating with banks and collection agencies; disconnecting Dr. Cardarelli's home phone to obtain relief from collection calls; closing of Bank of America accounts to prevent further withdrawals by the bank; and preparing police reports and communicating with law enforcement agencies.  Based on Dr. Cardarelli's annual salary, each work hour is worth $120, so Dr. Cardarelli has lost approximately $4,800 in productive work time.

f.    Dr. Cardarelli's 20-year working relationship with Bank of America has been destroyed by the Siadatans, to Dr. Cardarelli's incalculable damage.

g.    Dr. Cardarelli's 20-year working relationship with Bank of America has been destroyed by the Siadatans, to Dr. Cardarelli's incalculable damage.

h.    Dr. Cardarelli cannot even predict how much additional expense he will have to incur as he attempts to resolve the financial mess deliberately caused by the Siadatans.

<u>CONCLUSIONS OF LAW</u>

Dr. Cardarelli seeks a non-dischargeable judgment against both of the Siadatans, based on (a) false pretenses, false representations and/or actual fraud [First Claim for Relief] and fraud by concealment

30

[Second Claim for Relief], both pursuant to Bankruptcy Code Section 523(a)(2)(A).  Dr. Cardarelli also bases his request for a non-dischargeable judgment on willful and malicious injury [Third Claim for Relief], pursuant to Section 523(a)(6).  The Complaint requests an award of both actual and punitive damages.

With regard to fraud:  In order to determine whether a debt is non-dischargeable under Section 523(a)(2)(A), the common law elements of fraud must be satisfied.  Thus, with regard to "false pretenses, false representations and/or actual fraud", the creditor must show that the debtor made representations that he knew were false, with the intention and purpose of deceiving the creditor; that the creditor justifiably relied on such representations; and that the creditor sustained damage as a proximate result of the misrepresentations.  *In re Sabban,* 600 F.3d 1219, 1222 (9th Cir. 2011).  With regard to fraud by concealment, it must be shown that the debtor concealed material facts, with the intention and purpose of deceit; that the creditor justifiably relied on such lack of disclosure; and that damages resulted.  *See, e.g., In re Apte,* 96 F.3d 1319, 1324 (9th Cir. 1996); *In re Tallant,* 218 B.R. 58, 65-66 (9th Cir. B.A.P. 1998); *Cooke v. Howarter*, 114 B.R. 682, 684-85 n.2 (9th Cir. B.A.P. 1990) [debtor's silence or concealment of a material fact is actionable under Section 523(a)(2)(A)].

The Court heard testimony at trial from all three parties, and received in evidence their written Testimonial Declarations. The Court finds that Siadatan's explanations of the various acts of fraud and

31

dishonesty attributed to him, although often quite detailed, lacked credibility or logic.  The testimony of Dr. Cardarelli, K. Cardarelli, and Liang was believable and consistent with the fact pattern as it emerged during trial.

The elements of fraud are satisfied in this case, by virtue of both the misrepresentations and facts concealed by the Siadatans.

With regard to Dr. Cardarelli's $12,000 loan:  Siadatan obtained the loan through a series of deliberate false statements.  For example:  Siadatan told Dr. Cardarelli he needed a $12,000 loan because he was buying a house in Roseville, and could only obtain special financing from the builder by paying down $12,000 of the equity line of credit on the condominium he owned in Sammamish, Washington.  In fact, he never owned a condominium; there was no line of credit; and he was not buying a house in Roseville.  Dr. Cardarelli justifiably relied on the misstatements, based on his longstanding close friendship with Siadatan.  In addition, Siadatan misrepresented his educational and career history (*e.g.*, that he had graduated from college) to assure Dr. Cardarelli that Siadatan would be able to repay the loan.

With regard to all the credit card charges for which the banks in question are seeking to hold Dr. Cardarelli responsible:  Dr. Cardarelli never agreed to be a guarantor or obligor on any of those credit cards, and did not even know that Siadatan had obtained most of them; Siadatan forged Dr. Cardarelli's signature on one guarantor form, and inserted Dr. Cardarelli's name on others, all without Dr.

32

Cardarelli's knowledge.  Also, Siadatan expressly agreed that he would only use the FPM credit cards for legitimate business expenses; neither Siadatan nor D. Siadatan had any authority to use the cards for non-business purposes. Siadatan misrepresented that the only FPM accounts that existed were current, that they were used only for business purposes, and later that all the accounts had been closed. Siadatan concealed from Dr. Cardarelli the fact that long after FPM's business had become dormant, Siadatan continually sought and obtained credit line increases on multiple cards, and quickly charged purchases that approached or exceed the credit limits.  Siadatan concealed the fact that he had obtained an FPM credit card for D. Siadatan; and the fact that both Siadatans were charging thousands of dollars on the FPM cards at places like Nordstrom, Starbucks, Williams-Sonoma, airlines and beauty salons.

The Siadatans had neither the means, expectation nor intention to make more than token payments against the tens of thousands of dollars they had charged.  They had every intention of leaving Dr. Cardarelli wrongfully liable for payment, and of escaping their own *admitted* responsibility for the charges by filing for bankruptcy.

Siadatan concealed his fraudulent activities from Dr. Cardarelli by first claiming, falsely, that he had been the victim of identity theft; by claiming that the credit cards in question had been cancelled; that the credit cards had never been used for personal purposes; and that the accounts had been closed.

33

Siadatan concealed the fact that there had been no identity theft, that he had obtained FPM cards without Dr. Cardarelli's knowledge, that the cards had not been cancelled, that they had been regularly used for personal purposes, and that D. Siadatan had obtained her own FPM card and was using it for personal purposes. Siadatan concealed from Dr. Cardarelli that he had repeatedly increased the credit lines on the supposedly cancelled cards, and that the charges shown were accurate.

Meanwhile, Siadatan attempted to perpetuate the couple's scheme to fraudulently charge goods and services without paying for them by operating what appeared to be a "kite": Month after month, they purported to deposit, into the FPM checking account, checks drawn on the credit card accounts in amounts that greatly exceeded the Siadatans' *total* monthly income; and then to write checks on the bank account to the credit card issuers whose checks the Siadatans had deposited. Thus, they were able to show deposits into the bank account and payments out of the bank account where no "real" money had ever been deposited or paid.

Had Dr. Cardarelli been told the truth about any of these activities, he could have mitigated or avoided his potential damage. Instead, because he believed the false "identity theft" story, believed there were no open accounts, and believed there was no actual balance owed on any credit cards, Dr. Cardarelli lost credibility with the banks when the truth was discovered; has thus far he has been been unable to resolve the situation with them.

34

A debtor's fraudulent intent may be established by circumstantial evidence or by inferences drawn from his or her course of conduct. *In re Wills,* 243 B.R. 58, 64 (9th Cir. B.A.P. 1999). In this case, there is both direct and circumstantial evidence to establish fraudulent intent, and the Siadatans' course of conduct likewise establishes fraudulent intent.

The Court finds that Siadatan fraudulently represented to the issuing banks that Dr. Cardarelli had guaranteed all of the Siadatans' personal credit card charges. The Siadatans have unequivocally admitted, in testimony and in their schedules, that they bear full responsibility for the charges.

The amount of indebtedness to be deemed nondischargeable extends to all losses incurred by the creditor as a result of the debtors' fraud. *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998); *Muegler v. Bening,* 413 F.3d 980, 983 (9th Cir. 2005). In addition to the money received, the Siadatans also obtained "property" through fraud for purposes of Section 523(a)(2)(A) by obtaining the alleged guaranties. *See Matter of Everman,* 72 B.R. 687, 690 (Bankr. M.D. Fla. 1987).

Dr. Cardarelli has been damaged by the Siadatans' conduct. Bank of America took $6,283 from his account; he lost the $12,000 lent to Siadatan; he faces possible exposure for more than $95,501.14 (plus interest) in fraudulent credit card charges (an amount which is not disputed); and his credit rating has been severely damaged. Not one of the unpaid charges on any of the credit card bills, at any time, was made by or with the knowledge of Dr. Cardarelli.

35

Including attorney's fees he has had to expend in the effort to demonstrate that the liability to the credit card issuers is the Siadatans', not his, Dr. Cardarelli has incurred actual damages of at least $116,184.47. *(This removes the Plaintiff's claim for $27,000 in current attorney fees which is now conceded to not be a proper claim of the direct damages but is now claimed as a part of Plaintiff's claimed punitive damages.)*

The Siadatans' indebtedness to Dr. Cardarelli is also nondischargeable pursuant to Section 523(a)(6), because it was incurred through "willful and malicious injury".

The concept of "willful and malicious injury" under Section 523(a)(6) describes intentional torts. *See Kawaauhau v. Geiger,* 523 U.S. 57, 61-62 (1998). The harm which the Siadatans inflicted upon Dr. Cardarelli was not accidental or inadvertent; it was the product of a concerted tortious scheme. Because it was "deliberate or intentional", the conduct was "willful". *Id.,* 523 U.S. at 61, 118 S.Ct. at 977 n.3.

Likewise, the Siadatans' acts were "malicious" because they were "wrongful and without just cause or excessive", irrespective of whether there was personal hatred or ill will. *See Matter of Ormsby,* 591 F.3d 1199, 1207 (9th Cir. 2010); *In re Deerey,* 371 B.R. 525, 534 (M.D. Fla. 2007). "Malice" does not require an evil or rancorous motive; it is sufficient that the debtor has acted wrongfully and without just cause, or in knowing disregard of the rights of another. *In re Bernstein,* 197 B.R. 475, 479 (Bankr. D. Md. 1996), *aff'd,* 113

36

F.3d 1231 (4th Cir. 1997); *In re Grynevich,* 172 B.R. 888 (Bankr. N.D. Ill. 1994).

The Siadatans' scheme was wrongful, willful, malicious and excessive. Accordingly, Dr. Cardarelli's claims against them are nondischargeable under Section 523(a)(6).

Intentional fraud is actionable under Section 523(a)(6), even when Section 523(a)(2) also applies. *Matter of Stokes,* 995 F.2d 76, 77 (5th Cir. 1993); *In re Dorsey,* 162 B.R. 150, 155 (Bankr. N.D. Ill. 1993). Where, as here, a debtor has defrauded his business partner, Section 523(a)(6) applies. *In re Krishnamurthy,* 209 B.R. 714, 720-21 (9th Cir. B.A.P.), *aff'd,* 125 F.3d 858 (9th Cir. 1997), *cert. denied,* 524 U.S. 930 (1998).

Section 523(a)(2)(A)'s prohibition against discharge of any debt incurred through fraud may include punitive damages. *See Cohen v. de la Cruz, supra,* 523 U.S. at 214, 118 S.Ct. at 1214. *Se also In re Sabban, supra,* 600 F.3d at 1224; *Muegler v. Bening, supra,* 413 F.3d at 981. Moreover, while *Grogan v. Garner* left open the question of whether punitive damages were appropriate under Section 523(a)(2), *Grogan* suggested (and other courts have clarified) that punitive damage awards are appropriate under Section 523(a)(6). *Grogan v. Garner, supra,* 489 U.S. at 279, 282 n.2; *In re Bugna,* 33 F.3d 1054, 1059 (9th Cir. 1994). Indeed, the same deliberate fraudulent conduct for which actual damages are awarded under Section 523(a)(2) justifies an award of punitive damages under Section 523(a)(6). *In re Britton,* 950 F.2d 602, 606 (9th Cir. 1991); *see also In re Braun,* 327 B.R. 447,

37

452-53 (Bankr. N.D. Cal. 2005).

Under the circumstances of this case, punitive damages are appropriate, not only because of the willful and malicious nature of the Siadatans' conduct [*see* Cal. Civ. Code § 3294(a)], but also because Dr. Cardarelli has suffered (and may continue to suffer) substantial damage and losses that are not readily quantifiable. Punitive damages in three times the amount of actual damages are reasonably imposed in this case.

The Court also notes that D. Siadatan is liable, jointly and severally, for all the damage incurred by Dr. Cardarelli, for multiple reasons.  First, the Siadatans did not make, and have waived, any argument that there was any difference, as between them, in terms of liability.  Second, in any event, both debtor spouses are liable for the tortious conduct of either of them, where both spouses consented to the conduct *or* the conduct benefited the community.  *In re Kirkland,* 2008 WL 8444824, slip opn. at 13 (9th Cir. B.A.P. 2008). Where the community shares in the benefit of an intentional tort committed by one spouse, it must also share in the consequences. *Marriage of Bell,* 49 Cal.App. 4th 300, 310 (1996).  Third, D. Siadatan knowingly used her FPM business credit card for personal purposes, had no basis for believing the charges would ever be paid, and joined in filing the petition herein in the hope of escaping any responsibility for the charges.  Fourth, as an experienced and credentialed legal assistant, whose income was essentially the sole source of funds for the Siadatans, D. Siadatan can neither credibly nor reasonably contend

that she made charges at Nordstrom and all the other merchants in question without any understanding of whether the Siadatans had any money with which to pay those charges.  And fifth, it is the debt, not the debtor, that is denied discharge under Section 523 (as contrasted with Section 727); thus, where a debt is held non-dischargeable in a case in which both spouses are debtors, the creditor has the same right to recover against the community as existed prior to the filing of the petition.  11 U.S.C. § 524(a)(3); *Meneley Motors, Inc. v. Giantvalley,* 14 B.R. 457, 459 (Bankr. D. Nev. 1981).

In short:  The Siadatans used blatantly false representations to obtain a loan from Dr. Cardarelli; concealed their willful and fraudulent use of his name as a guarantor of FPM charges; and fraudulently charged in excess of $95,000 in personal expenses that Dr. Cardarelli neither knew about, authorized, nor had any obligation to pay.

The Siadatans' indebtedness to Dr. Cardarelli is non-dischargeable pursuant to both 11 U.S.C. § 523(a)(2)(A) and 11 U.S.C. § 523(a)(6).  A separate judgment shall issue so stating, and awarding damages against the Siadatans jointly and severally, in favor of Dr. Cardarelli, in the sum of $116,184.47, plus punitive damages in the sum of $348,553.41.  The total of the non-dischargeable judgment is therefor $464,737.88. A separate order shall issue.


DATED; July 18, 2012

RICHARD T FORD, Bankruptcy Judge

39

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**

**CERTIFICATE OF MAILING**

The undersigned deputy clerk in the office of the United States Bankruptcy Court for the Eastern District of California hereby certifies that a copy of the document to which this certificate is attached was mailed today to the following entities at the addresses shown below or on the attached list.

Dale Orthner
395 S Hwy 65 #300
Lincoln, CA  95648

Office of the U.S. Trustee
Robert T Matsui United
States Courthouse
501 I Street, Room 7-500
Sacramento, CA 95814

Dr. Roberto Cardarelli
c/o Peter Bronson
770 L STreet, Suite 950
Sacramento, CA  95814

Lewis Partridge
PO Box 863
Sloughhouse, CA 95683

Mohamadreza and Dawn Siadatan
3064 Ardley Drive
Roseville, CA  95747

**DATED:** July 24, 2012          **By:** _____
                                        Deputy Clerk

**EDC 3-070 (Rev. 6/28/10)**